## Manuel v. Louisville & Nashville Railroad Co.

(Decided October 3, 1919.)

Appeal from Kenton Circuit Court
(Criminal, Common Law and Equity Division).

Master and Servant—Railroads—Safe Place to Work—Negligence. —Because of the steepness of the grade at a point on defendant's line of railway, it was customary for the head brakeman to run in front of the freight train ascending the grade and turn the switch, in order that the train might take the siding without stopping. To do this it was necessary for the head brakeman to get off the engine at a point 600 or 700 feet from the switch. Plaintiff, who was head brakeman on a freight train, got off at a point about 900 feet from the switch for the purpose of throwing the switch, and owing to the darkness of the night and the in-

sufficiency of the light from the engine, fell into an open culvert: Held, that as plaintiff got off the engine without any signal to do so, at a point much farther from the switch than was reasonably necessary, the defendant company was not guilty of negligence in failing to provide barriers around the culvert or a pathway across it.

JOHN E. SHEPARD for appellant.

BENJAMIN D. WARFIELD and S. D. ROUSE for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

O. L. Manuel brought this suit against the Louisville & Nashville Railroad Company to recover damages for personal injuries. At the conclusion of plaintiff's evidence the court directed a verdict in favor of the defendant. Plaintiff appeals.

Defendant's line of railway is double-tracked from Corbin to Sinks, and is single-tracked from Sinks to a point about a mile south of Winchester where the double track begins again and and continues to Cincinnati. Ascending from the Kentucky river towards Winchester there is a steep grade. On this grade the line is single-tracked, and in order for trains to pass each other at Flanigan, it is necessary to take the siding at that point. According to plaintiff's evidence it was impracticable to stop a heavy freight train for the purpose of entering this siding, and therefore customary for the head brakeman to turn the switch leading into the siding while the train was in motion. On the occasion of the accident, which occurred on the night of November 26, 1916, plaintiff was acting as head brakeman upon an interstate freight train consisting of two engines and forty-five cars, bound from Corbin to Covington. The train stopped at Shearer, which is a few miles south of Winchester, to get water and a "19 order," which apprised those in charge of the train that southbound passenger train No. 31 was on time, and that it was necessary for the freight train to take a siding in order to let it pass. Upon receiving the order the engineer of the front engine said to plaintiff, "I think I can get to Flanigan, provided one of you boys throw the switch and not stop me." Plaintiff replied, "I will be up on the engine helping the fireman, and I will get the switch for you." After the train got under way, the engineer again asked plaintiff if he would get the switch and not stop him, and plaintiff said:

: "Yes, sir." Plaintiff then got out on the pilot and the engineer shut off the steam like he was going to stop. The night was dark and foggy and the headlight on the engine gave but little light. Plaintiff thought that the engine was going to stop and that they were right on the switch target. He then jumped down and gave the high ball. After running five, six or seven steps he fell into an open culvert or underpass, constructed for the purpose of letting water through. At that time there was a green light both on the switch and on the semaphore, located only a few feet from the switch. He could see the green light ahead of him, but could not tell whether it was the semaphore light or the switch light. He could not see the culvert on account of the density of the fog, although he carried a lantern in his hand. Plaintiff knew that there was a water way there but never noticed it particularly. He had been employed by the railroad for over four years and had been on that division for several months. Plaintiff should have had 600 or 700 feet in which to throw the switch. The point at which he got out was "to some extent" a pretty long distance to get off the engine in order to run ahead and throw the switch. He was fooled by the darkness and fog into believing that they were nearer the switch than they were, and he thought they were nearer because the engine shut off steam.

Harry G. Meiners, a civil engineer, testified that the underpass was 893 feet from the switch. He further testified that there was ballast between the ties over the trestle, and that the trestle was of the kind ordinarily in use at such places.

Charles G. Moore, a brakeman in the employ of defendant, testified that if the train was going about six miles an hour a brakeman would need about 200 yards in order to have time to get off the train and run ahead and throw the switch.

The case arises under the Federal Employers' Liability Act. Ordinarily, a railroad company is not liable for an injury to an experienced brakeman or switchman, caused by his falling into an open culvert or drain. Haggerty v. Chicago, M. & St. P. R. Co., 141 Fed. 966; Lindsay v. New York, N. H. & H. R. Co., 112 Fed. 384. But it is insisted that this rule should not apply to the facts of this case because plaintiff and other head brakemen were required to get off the moving train, and run along the track in front of the train for the purpose of

opening the switch and letting the train into the siding, and that, in these circumstances, the railroad's duty to use ordinary care to furnish such employees a reason- ably safe place to work required it to place guard rails around the culvert, or to build a pathway across it. There might be some merit in this contention if the culvert were located so near to the switch as to make it reason- ably necessary for an ordinarily prudent brakeman to cross the culvert in order to have time to throw the switch for the approaching train. But no such case is presented. Plaintiff himself admits that a distance of 600 or 700 feet was all that was necessary, whereas the culvert was 893 feet from the switch, and plaintiff got off at a point 25 or 30 feet from the culvert. In other words, he left the engine at a point at least 200 feet, and probably 300 feet, farther from the switch than was reasonably necessary. Had he been directed to leave the engine at that place, a different case would be pre- sented. All that he claims is that the engineer shut off the steam, and he construed this as an invitation to alight. However, it does not appear that any such sig- nal was agreed on, or that it was customary to use this method of informing the head brakeman when it was necessary to leave the engine. As the case is presented, plaintiff left the engine of his own volition, and without any direction or signal to do so. We conclude that the company was under no duty to anticipate that he or other head brakemen would cross the culvert, and its failure to construct barriers around the culvert or a pathway across it, and thus provide against an accident that it had no reason to believe would ever occur, was not negligence on its part.

Judgment affirmed.